## VIRGINIA COUPON CASES.

### GORMAN v. SINKING FUND COM'RS.

*(Circuit Court, E. D. Virginia. November, 1885.*

1. STATUTORY CONSTRUCTION — LEGISLATIVE INTERPRETATION — RETROSPECTIVE ACTS.
   Where a statute is passed by a legislature declaratory of the meaning of a statute previously passed by that body, such interpretative act cannot be retrospective in its operation, and deprive the courts of the power to put their own interpretation upon the original statute and determine rights vested under it prior to the passage of the interpretative statute.

2. SAME—STATE DEBTS—COMPROMISE WITH CREDITORS.
   Where a state has, by statute, offered to compromise with its creditors, it may at any time change or withdraw such offer so far as relates to those creditors who have not accepted the terms of the offer.

3. SAME—ELECTION BY CREDITOR.
   Where such a statute gives to the creditor the privilege of accepting or rejecting the terms of the compromise proposed, the creditor must exercise his right of election by some positive act.

4. SAME—LEVIES DISTINGUISHED.
   The ruling relative to the duty of paying taxes in *Tacey* v. *Irwin*, 18 Wall 551, distinguished.

On a Petition for *Mandamus*. The opinion states the case.

*R. L. Maury*, for petitioner.

*F. S. Blair*, Atty. Gen., for respondents.

HUGHES, J. This is an application by a citizen of New York against defendants, who are residents and officers of Virginia, to require them

to fund according to the provisions of the Riddleberger act $16,000 in amount of certain past-due coupons of the class called "Consols," which were presented to the defendant on the thirtieth of December, 1884, and demand made for their funding in 3 per cent. Riddleberger bonds, dollar for dollar, the demand having been refused.

By an act of assembly passed on the twenty-ninth of November, 1884, the state had changed the rate at which consol coupons falling due before or on January 1, 1885, should be funded, from that of dollar for dollar, as provided in the Riddleberger act, to that of 50 cents on the dollar. The petitioner alleges, however, that the coupons which are the subject of his suit were all due and unpaid before the passage of the November act; that the defendants had systematically, notoriously, and as a publicly proclaimed rule of their conduct, refused to fund consol and other coupons dollar for dollar, and rendered vain and useless any demand upon them to fund coupons at that rate, and that, therefore, the duty of making an actual demand on his part was dispensed with. He claims, therefore, that his rights were not affected by the act of November, 1884, and that his petition should be granted.

The case differs from those of a similar character decided by this court in September, 1884, in the particular that, whereas, in all those cases demand was made upon the sinking fund commissioners, and judgments rendered before the act of November, here demand was not made nor suit brought until afterwards. I will first review those decisions, and then consider the present case. By the Riddleberger act of February 14, 1882, the legislature of Virginia made an offer to its creditors to settle the entire debt of the state upon terms set forth in its provisions. There were several different classes of state debt. One provision of the act referred to bonds and coupons issued under the funding act of March 30, 1871, called "Consols," and another to the bonds and coupons issued under the act of March 28, 1879, (the McCulloch act,) called "Ten-forties."

The Riddleberger act provided in clause a of section 5 that the principal of each consol bond, and the interest accruing upon it from the date when the last semi-annual coupon fell due to the date of exchange, should be funded at the rate of 100 of the old bond, and interest, to 53 of the Riddleberger bond; and that the coupons of the consol bonds due and unpaid should be funded in new bonds, dollar for dollar. It provided in clause b of section 5, in a similar manner, for funding the ten-forties, except that while the coupons were to be funded dollar for dollar, the bonds and fractional interest were to be funded at the rate of 100 for 60 of the Riddlebergers. The act provided that the new bonds should all bear date as of the first of July, 1882. The funding officers of the state construed the act as intending that no coupons should be funded at the rate of dollar for dollar except such as should have fallen due on or before July 1, 1882. By July, 1884, when as many as three installments of coupons had fallen

due after July, 1882, the creditors of the state had come to complain of that ruling, and at different times before the twentieth of August of that year suits were brought in this court to obtain a judicial construction of clauses *a* and *b* of section 5 of the Riddleberger act. They proceeded by petitions in *mandamus* against the members of the board of sinking fund commissioners, in which they prayed the court to require the defendants to fund in 3 per cent. Riddleberger bonds consol and ten-forty coupons which had fallen due after July, 1882, at the rate of dollar for dollar. There were some 20 or more petitions of this character. Each petitioner alleged that certain coupons of the classes mentioned had, at specified dates, respectively, been presented to the commissioners and equivalent 3 per cent. bonds demanded in lieu of them, and that these latter had been refused him. Upon these petitions alternative writs were issued, and at the hearing, most of them on the third of September, judgments were rendered in accordance with the prayers of the petitions, and copies of the judgments served upon the commissioners. The judgments were complied with by the board, and no writ of peremptory *mandamus* was issued in any instance.

In those cases the court felt no doubt on the subject of jurisdiction. They were not suits against the state of Virginia. The object for which they were brought was to obtain a judicial construction of an act of the legisature, and to require ministerial officers of the state to conform to that construction in discharging their ministerial duties. In those cases the jurisdiction question whether the state had passed a law impairing the obligation of a contract was not involved. The suits assumed the law on which they were based to be free from objection, and submitted for judicial determination the question, what did the legislature mean when it directed that certain coupons, due and unpaid at "dates of exchange," should be funded dollar for dollar? The legal reports are full of such cases of jurisdiction, and citation of them is useless. The petitioners had accepted the compromise and settlement proposed by the state in the Riddleberger act, and had a right to a judicial construction of the terms of their contract with the state. If they were residents of Virginia, they had a right to this construction from the state courts. If they were residents of other states, as was the fact, they had a right to it from the federal courts held in Virginia. The courts have necessary jurisdiction in such cases. In this country no person can plead privilege as an officer for his failure or refusal to comply with a law of the state, and plant himself upon his own construction of the statute in excuse. The constitutional doctrines of state sovereignity are not involved in the case. The sovereignty of the state is not impugned, but only the opinion of a ministerial officer.

In passing upon the numerous cases brought before it in August, 1884, this court held that the holder of past-due coupons, accepting the terms of the Riddleberger act, had a right to fund them dollar

for dollar in 3 per cent. bonds. Unless upon the pretension that these coupons were already paid by repudiation, which was not the theory of the Riddleberger act, no wrong or injustice or loss was imposed upon the state by the decision of the court. The state was in fact a gainer, in extinguishing cash demands against her treasury by the easy process of giving for them 3 per cent. bonds having nearly 50 years to run. The state expressly directed this to be done with respect to more than two millions of coupons which had fallen due before or on the first of July, 1882. It was the policy of the Riddleberger act to get in all overdue coupons on these easy terms.

Most of the judgments which have been mentioned were rendered on the third of September, 1884. The petitions in them had in every case been filed before the twentieth of the preceding month, after the coupons on which they were brought had been presented to the sinking fund commissioners and 3 per cent. bonds demanded in lieu of them. The petitioners, having accepted the offer of the state, had by this demand established a contract and secured the right to the execution of it according to its terms. Their contract had not only been completed, but by bringing suit they had given it the form of *lis pendens*, when, on the twenty-seventh of August, 1884, the legislature passed a statute purporting "to declare the true intent and meaning" of the Riddleberger act. This declaratory statute, after repeating *totidem verbis* the fifth section of the Riddleberger act, added a clause declaring that the phrase "date of exchange," employed in that section, should in all cases be intended to mean the first of July, 1882, and that date only.[1]

As this act was speedily substituted by a later one, it is hardly worth while to discuss its validity. So far as it undertook, in declaring the true intent and meaning of a previous statute, to give that meaning a retrospective operation, it was nugatory. It is not competent for the legislative department of government to declare the meaning of previous statutes for such a purpose. That is the province of the courts. If the new statute declares the law to mean what

---

[1] After quoting the fifth section as it stands in the Riddleberger act, the act of August 27, 1884, adds that "the date of exchange referred to in this act shall in all cases be taken to be July 1, 1882, and this act shall be construed as if it had been so expressed in the [Riddleberger] act, and no new bond shall, under this act, be given for any coupon or interest on registered bonds mentioned in this section maturing after the first day of July, 1882." If the true intent and meaning of the fifth section of the Riddleberger act had been as interpreted by the act of August, 1884, then it would have read as follows, substituting the words "July 1, 1882," for the words "date of exchange:" Riddleberger bonds shall be given "for the principal of all bonds, or other evidences of debt, embraced in Class A, at the rate of 53 per cent., that is to say, fifty-three dollars of the bonds authorized by this act, principal and accrued interest from the preceding period of maturity to *July* 1, 1882, at par, are to be given for every one hundred dollars face, principal and accrued interest from the preceding semi-annual period of maturity to *July* 1, 1882, of such indebtedness; and for any interest which may be past due and unpaid upon such indebtedness, funded bonds issued under this act may be given dollar for dollar." The substitution makes the section incongruous and impracticable of execution. I suppose that it was because the section was found, thus amended, to be impracticable of execution that it was found necessary to substitute it with the act of November, 1884.

the courts declare it to mean, then it is useless. If it undertake to give the law a meaning different from that given by the courts, then it is void. To declare what the law is or has been is a judicial function. To declare what it shall be, is legislative. Cooley, Const. Lim. 94. Therefore, whether valid or not as to creditors who had not offered to fund, no one will contend that the declaratory act of August 27, 1884, could operate retrospectively so as to affect rights already completed and vested, and it could not have been the intention of the legislature by that act to invalidate the rights of those creditors who had accepted the contract offered by the state, who had presented coupons for funding and demanded new bonds according to the terms of the contract, and whose rights stood upon the basis of *lis pendens.* The act of August 27th could not operate, therefore, to intercept the judgments which were rendered by this court on the third of September following, in the cases that have been mentioned.

Two months after its passage the legislature changed its views as to the true intent and meaning of clauses *a* and *b* of the fifth section of the Riddleberger act, and, as before stated, passed another act, that of the twenty-ninth of November, 1884, by which it forbade the funding either of coupons maturing or fractional interest accruing after January 1, 1885; but, among other things, declared that the ten-forty coupons which fell due before or on the first of January, 1885, should be funded at the rate of dollar for dollar, and that coupons of consol and other bonds which fell due before or on the said date should be funded at the rate of 50 cents on the dollar. The petitioner in the case before the court has demanded that his consol coupons, which are of the latter class, shall be funded at the rate of dollar for dollar, and not at the rate of 50 cents on the dollar.

There can be no doubt of the validity of the law of November, 1884. This court said in its decision in the case of *Faure* v. *Sinking Fund Com'rs, ante,* 641, that "it was competent for the legislature, within some reasonable time, to declare that after a future date unpaid and past-due coupons, detached from consol bonds, shall not be funded dollar for dollar." The court now repeats that it was competent for the legislature, at its discretion, to put a stop to funding at this rate, though good faith would seem to have required that reasonable previous notice of the date when its inhibition should go into effect should be given to the state's creditors. It was after the passage of this latter act that the petitioner in the case now before the court presented the consol coupons described in the petition by dates and numbers, which had all fallen due since July 1, 1882, to the board of sinking fund commissioners and demanded 3 per cent. bonds in lieu of them. The demand was made on the thirtieth of December, 1884, and was refused by the board. The petitioner alleges, by way of excuse for not having made the demand before, that the board had established and declared publicly, as a rule of their official conduct, that in no case would it exchange bonds under the Riddleberger

act for coupons of consol bonds maturing after July 1, 1882, dollar for dollar.

The present case, as before stated, differs from those in which judgments were given in September, 1884, by this court, in which the demand for funding was made before the passage of the act of November, 1884; demand having been made in this case after the passage of that act. The petitioner by his counsel alleges, as evidence that the commissioners had, as a rule, refused to fund past-due consol coupons dollar for dollar, that the records of this court show that there had been dozens of such cases of refusal, and that the act of August 27, 1884, expressly forbade such funding. He insists that this legislation, to have been legal, should have provided that the funding should cease only after a future date, so that opportunity should first be afforded, by previous notice, for the acceptance of the offer of the state before it could be legally withdrawn. He maintains that by abruptly withdrawing the privilege of funding coupons without previous notice the legislature actually preserved the right in greater force than ever. He argues that a continued and notorious refusal to accept coupons when offered dispensed with the necessity of making the offer and demand, inasmuch as the law does not require the performance of a vain act, and therefore that every holder of coupons that fell due at dates anterior to the act of November, 1884, may now have them funded exactly as if he had made a tender of them, which would have been fruitless. He claims that in such cases the law presumes that a tender would have been made but for the publicly proclaimed purpose of the commissioners in all cases to reject it. He cites, in support of this proposition, *Tacey* v. *Irwin*, 18 Wall. 551, 552; *U. S.* v. *Lee*, 106 U. S. 202; S. C. 1 Sup. Ct. Rep. 240; and *Hills* v. *Exchange Bank*, 105 U. S. 319. In the second of these cases, better known as the *Arlington Case*, the United States supreme court say that "where the tender of performance of an act is necessary to the establishment of any right against another party, the tender or offer is waived and becomes unnecessary when it is reasonably certain that the offer will be refused." The force of this reasoning must be acknowledged to be very great, and my first impressions were that it controlled the present case. But the decisions cited were cases of federal direct taxes. In the first two of them the taxes had been tendered by friends of the owners of the property taxed during the late sectional war. The owners were sympathizers with the insurgent states, and had gone within their military lines. The *Arlington Case* was a conspicuous example of a very numerous class of cases. The federal tax commissioners refused to receive the taxes due from any but actual owners of the property taxed. The supreme court had decided in *Bennett* v. *Hunter*, 9 Wall. 326, that a tender of taxes by another than the owner was valid, and that the titles of those who purchased the property when sold for the taxes were void. In *Tacey* v. *Irwin* the supreme court went further, and

held that the tax commissioners, by making it publicly known to be their rule of conduct that they would not receive taxes from others than owners, rendered a tender of the taxes unnecessary, and invalidated the sales of property forfeited for them. The principle settled was that the titles of property sold for taxes under such circumstances were null and void, and that the owners of the property, who came in and claimed it after the sales, were entitled to recover on paying into the treasury the original taxes which had been assessed upon it.

There is an obvious distinction between such cases and the one at bar. What may be presumed in regard to a tax may not be presumable of a statutory contract. When the state makes a proposition to her creditors which they are at liberty to accept or reject, and which some of them are likely to accept and others to reject, a positive election is necessary on the part of each creditor in order to the completion on his part of the contract proffered. But the payment of a tax is a duty incumbent on a citizen as to which he has no option. The idea of contract cannot well enter into the matter, unless it be the presumption that the citizen has promised to pay the tax from the moment it is levied. He is always under contract to pay it; and when he offers to pay, or another offers to pay for him, and the tax receiver obstructs the payment, then a set of rights arise peculiar to that particular case; and the decisions of courts in such cases are to be confined in their operation to the special class of cases to which they were addressed. A statutory contract proposed by a state to her creditors is of a wholly different nature. The creditor may or may not be a citizen of the state. He may accept the proffered contract or not, at his discretion. His acceptance is optional. It is a matter of election and choice. He must elect what he will do, and there can be no presumption that he has made an election until he positively signifies that he has done so. No obstructive action on the part of ministerial officers of the state can exonerate him from the act of election, or can take the place of his own election signified by his individual action. It is elementary law that a contract cannot exist until it is proposed by one party and accepted by another. The minds of two persons must meet in accordance and agreement upon its terms.

The cases of *Tacey* v. *Irwin* and *U. S.* v. *Lee*, cited in the petitioner's brief, did not refer to the acceptance of a statutory contract, but to the performance of a statutory duty. Official perverseness might, by preventing, exonerate, the citizen from discharging a *duty* which he was ready to perform, or have performed in his behalf; but a judicial ruling to that effect can have no application to a creditor's consent to a contract offered by a state in cases where there must be an actual consent, where this consent must be the act of his own individual volition, and where the proof of it must be positive and supplied by himself. I do not think that the rule in *Tacey's Case* and in the *Arlington Case* will ever be extended by the supreme

court, or that it will ever be applied except where the performance of a *duty* imposed by law is prevented by the obstructive action of the official appointed to receive it, and produces penal results. At all events, I do not feel at liberty to apply it to a case of statutory contract, where the positive acceptance of its terms was necessary to establish the right of the individual citizen, and where at least a notification of his acceptance could have been effected in spite of the obstructive conduct of public officers.

In the case at bar the petitioner does not aver that he had accepted the terms of funding offered by the state in the Riddleberger act; or that he had formed the purpose of accepting before the passage of the amendatory act of November, 1884; or that he was prevented from executing that purpose by the conduct of the sinking · fund commissioners. Technically, his petition is at fault in these respects, and the attorney general's demurrer must. be sustained. On the merits also, for the reasons I have stated, I should feel bound to dismiss the petition. Judgment must therefore go for the defendants. Writ denied.